**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 07 CR 227 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| JOHN TOMKINS | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant John Tomkins's motion for reconsideration of detention order [205]. For the reasons set forth below, the motion [205] is respectfully denied. Defendant's related motion for a status hearing in order to set the conditions for release—a courtesy copy of which was received yesterday from Defendant's stand-by counsel—therefore also is denied.

**I.      Factual Background**

**A.      Charges in the Superseding Indictment**

The superseding indictment alleges that between approximately May 2005 and January 2007, Defendant John Tomkins mailed a series of threatening letters and packages, including pipe bombs, to various investment firms and their employees. Through those letters and packages, Defendant allegedly attempted to induce the investment firms and their employees, by threats of kidnapping, bodily injury, and death, to manipulate and cause the common stock of 3COM and Navarre Corporation to trade at artificially high prices, thereby fraudulently increasing the market value of Defendant's investment positions in those stocks.

As to 3COM, the superseding indictment specifically alleges the following: From about January 2005 and continuing through September 2005, Defendant acquired shares of 3COM stock and call option contracts. Beginning in May 2005, and continuing through October 25,

2005, Defendant sent a series of three threatening letters to investment company executives in which he attempted to induce the executives to manipulate the price of 3COM stock by making purchases sufficient to drive the price of the stock to $6.66 by October 31, 2005.  In a letter to an investment company executive dated May 23, 2005, Defendant wrote:  "I need for you to start buying stock in 3Com Corporation (COMS). You have until October 31 to get the price to 6.66. If you can accomplish it sooner all the better that way you will not have to worry about hearing from us again but it MUST be done by then NO EXCUSES."  The indictment further alleges that Defendant warned that, if his demands were not met, the executive could suffer grave consequences:  "You will help, after all it is so easy to kill somebody it is almost scary. Just think it could be as simple as mailing a package just like The Unibomber used to do, or maybe like Salvo did in the D.C. sniper case just a small hole in the trunk of the car and BANG!!"  The letter also warned:  "[P]ossibly the worst thing that can happen to someone is to have a child or grandchild go missing. Kids are snatched all the time."  Finally, the letter cautioned the executive not to go to the authorities:  "And don't even think about going to the authorities because as I said there are so many choices for me to be able to reach out and touch your life that it is not worth the risk."

The indictment further alleges that Defendant attempted to similarly manipulate the price of Navarre Corporation stock for his own financial benefit.  According to the indictment, Defendant purchased shares of Navarre stock beginning in January 2006 and continuing through December 2006, and also purchased shares of Navarre call option contracts beginning in February 2006 and continuing through March 2007.  Then, in approximately March 2006, after making his initial Navarre stock and option purchases, and continuing through February 2007, Defendant sent a series of threatening letters to investment companies and investment company

executives, in which he demanded that sufficient purchases of Navarre stock and options be made to drive up the price of the stock to certain target prices, by certain deadlines. For example, on approximately March 13, 2006, Defendant mailed four letters, including one to a senior officer of Navarre. In that letter, Defendant complained of the officer's compensation and the decline in the price of the company's stock, and made threats against the executive and his family:

> The way I see it you owe it to us to make things right or I will make your life as miserable as mine. The one thing that you need to remember is that no one is out of reach * * * * You will help, after all when you stop and think about how easy to kill somebody it is almost scary. Just think it could be as simple as mailing a package just like The Unibomber use to do it is so easy it can be done from anywhere and if it wasn't for the fact that he was turned in by his own brother he may have never Salvo did in the D.C. sniper case just a small hole in the trunk of the car with high powered riffle and BANG!!

The letter then set forth the following demands:

> By now you are wondering what I am expecting from you, well it is rather simple actually, within the next 60 days you are going to find a way to reverse the downward spiral of the stock price and get it over $6.66 or the devil will be paying you a visit. I do not care if you have to buy all the shares yourself. It would do wonders for the stock price if there was to be a rumor that you were thinking of taking the company private it sure would fuck with all those asshole short sellers or if you have to you could suck off a couple of mutual fund mangers in order to get them to buy this stock * * * I really don't care but whatever you do the price had better reverse in a hurry.

The three other March 13 letters were addressed to investment company executives, contained similar threatening language, and demanded that the corporation stock price move to $6.66 by May 1, 2006.

In addition, according to the superseding indictment, on or about June 9, 2006, Defendant mailed approximately four more letters from Palatine, Illinois. Three of those letters were addressed to investment management executives and stated:

TIMES UP

LET'S MAKE THIS INTERESTING SHALL WE. I HAVE ACQUIRED 3 TARGETS. ONE IS A RELATIVE, ONE IS A CO-WORKER'S RELATIVE AND ONE IS A FRIEND OR NEIGHBOR. IF FROM JUNE 13 THROUGH JUNE 17 NAVR'S CLOSING STOCK PRICE IS GREEN ON ONE OF THE FOUR DAYS I WILL SHIP ALL THREE PACKAGES. IF IT ENDS GREEN ON TWO OF THE DAYS I WILL SHIP TWO PACKAGES, IF IT ENDS GREEN ON THREE OF THE DAYS I WILL SHIP JUST ONE. IF ALL FOUR DAYS END GREEN THEN YOU WILL HAVE BOUGHT YOURSELF ANOTHER MONTH.

IT IS BETTER TO REIGN IN HELL, THAN TO SERVE IN HEAVEN

The indictment further alleges that on January 26, 2007, Defendant deposited for mailing at the Rolling Meadows Post Office in Rolling Meadows, Illinois, two parcels addressed to individuals at investment firms. One parcel was addressed to an individual at Janus Small Cap ("Janus") in Denver, Colorado. A second parcel was addressed to an individual at American Century in Kansas City, Missouri. Each parcel contained an improvised explosive weapon, commonly known as a pipe bomb, and a letter stating as follows:

BANG!! YOU'RE DEAD

Stop and think about that for a second. Think about the effect it would have on your family. The only reason you are still alive is because I did not attach one wire. If you do not believe me then go ahead and touch that red wire to the top of the battery pack. There is enough gunpowder and steel shot in that tube to kill anyone in a ten foot radius when it goes off.

Now imagine how you will feel when I mail that same package to one of your family members or neighbors or co-workers and yes I will be sure to connect all the little wires.

Now if you decide you want to keep the people around you safe, you will do as I say.

On February 7, 8, & 9 there is going to be a rally in the stock price in a company called Navarre (NAVR).

On the 7th the closing price will be above 4.90

On the 8th the closing price will be above 5.75

And on the 9th the closing price will be above 6.50

This is not a hoax.

There is nothing the police or anybody else can do so do not contact them.

Everything that it takes to make these little care packages can be purchase at any Home Depot& Wal-Mart so there is nothing to be traced. There are no finger prints or DNA and nothing to match it to, so be smart and do what I am asking.

Although you are not alone, all of you will be punished if you fail.

On April 25, 2007, law enforcement officers arrested Defendant and executed search warrants at his residence, at two storage units rented by Defendant, at his place of business, and on various vehicles. The Government states that, among other things, the search of Defendant's residence led to the seizure of financial records showing Defendant's purchases of 3COM and Navarre stock, drafts of the threatening communications sent to the victims, research into the addresses of and other locations associated with the victims, proof of travel to Orlando, Florida, during the time in which some of the threatening communications were mailed from Kissimmee, Florida, and documents and other records related to bomb making. Among other things, the search of Defendant's storage unit led to the seizure of bomb making materials, including materials similar to those used to build the devices mailed in January 2007, two improvised explosive devices, one of which was packaged and ready to be mailed, drafts of the threatening communications sent to the victims, and addresses and other information relating to the victims. Among other things, the search of Defendant's vehicles led to the seizure of bomb making materials.

On April 25, 2007, Defendant was arrested in Dubuque, Iowa and transported to Chicago, Illinois. Defendant is charged in a superseding indictment with ten counts of mailing threatening communications, 18 U.S.C. § 876(b), two counts of illegal possession of a destructive device, 26

U.S.C. § 5861(d), and one count of using a destructive device in connection with a crime of violence, 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(B)(ii).

**B.    Bond/Detention Proceedings to Date.**

On April 30, 2007, Magistrate Judge Schenkier denied bond.  On June 11, 2008, Defendant filed a motion to set conditions for release, which Magistrate Judge Schenkier granted on June 23, 2008.  The Government then filed a motion to vacate the release order.  On July 2, 2008, Judge Lindberg, the district judge previously assigned to this matter, granted the Government's motion to vacate, finding that while Defendant did not pose a flight risk, he continued to pose a danger to the community, such that the set of conditions proposed by the magistrate judge could not reasonably assure the safety of the community.

On August 12, 2010, Defendant filed a motion for reconsideration of release pending trial, which Judge Lindberg denied on August 19, 2010.  In that order, Judge Lindberg found that Defendant "still would present a serious risk of danger to the community if he was released, and that there still is no condition or combination of conditions that would reasonably assure the safety of the community."  Judge Lindberg also denied Defendant's due process challenge to his pretrial detention.  Defendant appealed that order to the Seventh Circuit Court of Appeals, which denied his motion.  Defendant then filed a petition for rehearing with the Seventh Circuit Court of Appeals.  The Seventh Circuit ordered the Government to respond, which it did on December 3, 2010.  The Seventh Circuit denied Defendant's petition for rehearing on December 10, 2010.  This case was transferred from Judge Lindberg's docket to this Court's docket in December 2010.

Defendant now asks the Court to reconsider Judge Lindberg's August 19, 2010 order denying his motion to reconsider the detention order in this case.  In this motion, Defendant

again challenges his detention under the Due Process Clause to the Fifth Amendment and, for the first time, under § 3164 of the Speedy Trial Act ("STA").[1]  Defendant has been held at the Metropolitan Correctional Center since April 2007.

## II.   Analysis

### A.   Due Process

Defendant argues that his continued detention violates the Due Process Clause of the Fifth Amendment. Defendant identifies two new facts in support of his argument, in addition to the facts raised and considered by the previous district court judge assigned to this case as well as by the Seventh Circuit on appeal from the district court's refusal to allow bond:  (1) his continued incarceration during the past year, and (2) purported discovery violations by the Government during that time period.  Defendant asserts that the Government is at fault for the delay in this case because:  (1) three different Assistant United States Attorneys (AUSAs) have been assigned to this case; (2) the Government has refused to enter into plea negotiations; and (3) the Government has committed certain alleged discovery violations and delays.

Pretrial detention is constitutional as long as it is and remains "administrative rather than punitive." *United States v. El-Hage*, 213 F.3d 74, 79 (2d Cir. 2000) (quoting *United States v. Salerno*, 481 U.S. 739, 746-51 (1987); *Bell v. Wolfish*, 441 U.S. 520, 535-40 (1979)).  In deciding whether the length of pretrial detention has become unconstitutionally excessive, courts consider:  (1) the detention's length, (2) the extent of the prosecution's responsibility for the delay, (3) the seriousness of the charges, and (4) the strength of the government's evidence concerning risk of flight and defendant's dangerousness.  *Id*.  Courts also consider the

---

[1]   In addition to full briefing on the motion, the Court also has received and considered two supplemental reply briefs filed by Defendant (see docket entries 213 and 215).  The issues raised in the motion present challenging and somewhat novel arguments, which the Court has attempted to address comprehensively in the most expeditious manner possible given their relative complexity.

complexity of the case. See *United States v. Cos*, 2006 WL 4061168, at *7 (D.N.M. Nov. 15, 2006). As discussed in detail below, all of these factors except for the first undercut Defendant's position.

Defendant correctly notes that three different AUSAs have been assigned to this case, but the record does not indicate that these substitutions caused significant delay. For example, Defendant filed a number of lengthy pretrial motions on January 6, 2009, including a motion to dismiss the securities fraud counts and a motion to suppress a number of search warrants. Despite the fact that new (and still current) government counsel was assigned to this case in December 2008, the Government filed its response to these motions on February 6, 2009, after requesting and receiving one, seven-day extension of time. A delay of seven days to respond to the extensive motions filed by Defendant does not constitute unreasonable delay. The STA recognizes that the Government is entitled to reasonable amounts of time to consider and respond to pretrial motions submitted by defendants, and a seven-day extension is not unreasonable. See 18 U.S.C. § 3161(h)(1)(D); see also See *El-Hage*, 213 F.3d at 76-77 (explaining that the pretrial detention was "extraordinary" and justified "because the lengthy delay in bringing defendant to trial [could] not be laid at the government's doorstep"); *cf. United States v. O'Connor*, 2011 WL 3849624, at *12 (7th Cir. September 1, 2011) (explaining in response to Defendant's Sixth Amendment speedy trial claim that the claim lacked merit because "O'Connor bears primary responsibility for many of the pretrial delays and did not suffer actual prejudice").

Second, Defendant's claim that the government was unwilling to enter into any plea negotiations is not supported by the record. Rather, Defendant's second attorney—John Beal— had numerous plea discussions with the assigned AUSA, and his proposals were considered in a meeting that Mr. Beal had with the First Assistant United States Attorney, the Criminal Chief,

the Chief of the Financial Crimes Section, a Deputy Chief of that same section, and current Government counsel. Current Government counsel also engaged in plea discussions with Defendant's third and fourth attorneys. Indeed, the record reflects that the Government's discussions with Defendant's fourth attorney—Defendant's current stand-by counsel Frank Lipuma—included considering a plea proposal submitted by Mr. Lipuma on behalf of Defendant. The record further reflects numerous status hearings after which Judge Lindberg noted on the record an exclusion of time for the purpose of "allowing the parties to attempt to negotiate a disposition of the case before trial." Defendant has not provided any basis for this Court not to accept those docket entries at face value. The fact that these plea discussions did not result in a plea agreement agreeable to Defendant does not mean that the Government acted in bad faith or was responsible for the delay in this case resulting from Defendant's attempts to resolve this case short of trial.

Defendant also asserts that the Government has delayed providing him with records in response to specific discovery requests. In March 2011, Defendant filed a motion to compel the Government to provide Defendant with 39 categories of additional discovery in this case. At a hearing conducted on March 30, 2011, Defendant withdrew his motion based on the Government's representations that it would provide the requested discovery. The Government did not litigate regarding the propriety of the requests or whether the items previously had been provided to Defendant. Although the Government complied with the requests, the volume of the materials as well as the fact that numerous requests needed to be redacted slowed the discovery process. Given that the requests came from Defendant, that they were numerous, and that the Government complied (albeit over time), the Court cannot conclude that the delay resulted in a violation of due process. Complex cases like this one frequently present discovery challenges –

and all the more so when continuity of defense counsel is lacking and the defendant ultimately elects to proceed as his own counsel.

Defendant also maintains that the Government delayed providing him with financial information concerning the common stockholders of the 3COM and Navarre. Defendant's request is based on the Government's assertions, in both the search warrant affidavits and the complaint affidavit that:

> Agents obtained Large Options Position Reports (LOPR) from the U.S. Securities and Exchange Commission (SEC) showing individuals with positions of at least 200 option contracts. Reports dated September 25, 2005 and October 25, 2005 were obtained for 3Com Corporation (COMS). Reports dated June 15, 2006 and January 30, 2007 were obtained for Navarre Corporation (NAVR). The only identified individual (i.e., non-institutional) investor account appearing on each of the four reports was in the name of John and Julie Tomkins, 2067 Grant St., Dubuque, Iowa.

Complaint Aff. ¶ 19. However, the materials requested in the February 2011 letter are lists of common stockholders, not individuals/entities holding option contracts of 3COM and Navarre. The Government states that the materials listing the holders of option contracts were produced to Defendant in late 2007, and the Court has no reason to doubt that representation.

Defendant further argues that he needed to bring an appeal to the Seventh Circuit before he was permitted to inspect the original items seized pursuant to various search warrants. However, the Government maintains, and Defendant does not dispute, that it provided Defendant with an inventory of all physical objects in its possession, and offered Defendant's various counsel supervised access to all physical evidence. Additionally, once Defendant decided to represent himself, the Government worked with Defendant and stand-by counsel to make arrangements for Defendant to review the evidence in April 2011.

As Defendant emphasizes throughout his filings, his detention has been unusually lengthy – a fact that this Court observed from the docket as soon as the case was transferred to its docket.

However, the length of detention alone does not give rise to a due process violation, either in general or specifically in this case. First, Defendant's own actions during the pretrial phase have caused a substantial amount of the delay. For instance, Defendant has gone through four attorneys and is now proceeding *pro se*. This turnover has caused significant delays in this case; indeed, each time a new attorney has assumed responsibility for the case, that new attorney (and more recently Defendant himself) has had to immerse himself in a complex case, which involves voluminous discovery materials, with documents numbering in the tens of thousands of pages. As each attorney who has represented Defendant has acknowledged, that process has taken a significant amount of time. Additionally, as Defendant has acknowledged at recent status hearings, that time now is magnified by the fact that Defendant is proceeding *pro se*.

Defendant also filed nine motions for extensions of time to file pretrial motions. As Judge Lindberg noted, those motions alone caused a delay of over one year. And Defendant has filed a motion to dismiss, a motion to suppress, motion for a change of venue, and a motion for a *Franks* hearing, all of which were resolved only after full briefing and in lengthy opinions by the assigned judges. Additionally, during the course of this case, Defendant has initiated an appeal and also petitioned for a writ of mandamus.

Perhaps most telling, in the context of the Court's efforts to set a trial date at the most recent status conferences, Defendant specifically opted for the later of the two proposed time frames for trial, acknowledging that he did not feel that he could be ready to go to trial until April 2012 because of additional work that he needs to do, including, among other things, hiring experts and analyzing the voluminous evidence in this case. In his reply brief, Defendant maintains that the reason that trial has been delayed until April 2012 is due to "scheduling conflicts with stand-by counsel and to allow the Court the ability to set aside sufficient time for

trial." He also concedes that he is attempting to resolve some issue with potential experts (although he maintains that this is not the reason for the delay in proceeding to trial). He concludes by noting that he "prefer[s] the April 2012 date," as it "appears to be the best date available for everyone, including the Government which will need to coordinate the schedules of dozens of out of state witnesses."

At a minimum, Defendant's statements showcase the complexity of this case, which is only magnified by Defendant's decision to replace three attorneys and ultimately to represent himself. Defendant's concessions indicate that he understands the work that must be done in advance of trial, which admittedly is compounded by the fact that he is proceeding *pro se* and hindered by his incarceration. The Court appreciates Defendant's concerns; however, the remaining factors simply overwhelm those concerns and foreclose either the finding of a due process violation or Defendant's pre-trial release on account of the length of his pre-trial detention.[2] Most notably, as Judge Lindberg stressed, the charges in this case are extremely serious. Defendant is charged in a superseding indictment with ten counts of mailing threatening communications, 18 U.S.C. § 876(b), two counts of illegal possession of a destructive device, 26 U.S.C. § 5861(d), and one count of using a destructive device in connection with a crime of violence, 18 U.S.C. § 924(c)(1)(A) and (c)(1)(B)(ii). DE 109. If convicted of these charges,

---

[2] The Court, too, recognizes that trial preparation would be more efficient for the parties and the Court if Defendant were released on bond. However, efficiency and convenience to the parties and the Court are not among the primary factors that courts are to consider in considering release on bond or the constitutionality of continued detention. Moreover, if courts were to take into account criminal defendants' *pro se* status in determining whether those defendants should be released on bond, it could provide an incentive for criminal defendants to represent themselves (at least temporarily) in order to enhance their eligibility for bond. On a related and perhaps even more fundamental level, the Court also sympathizes with Defendant's expressed desire to be reunited with his family, even as he prepares for trial. But that is a wish of almost every person who is detained pending trial and not a basis for disregarding the factors that the Court must consider under the pertinent statutes and case law in deciding whether bond is appropriate in all of the circumstances.

Defendant faces a statutory maximum sentence of life imprisonment and a mandatory minimum sentence of thirty years' imprisonment on the § 924(c) count alone.

Additionally, the allegations underlying the charges cannot be overlooked. Over approximately two years, Defendant allegedly mailed no less than ten letters to employees of various investment companies, threatening to kill those employees, their children, and their friends if the victims did not do as defendant demanded. In making these threats, Defendant invoked the images of the "D.C. sniper" and the Unibomber. When the threatening letters proved insufficient to achieve his objectives, Defendant allegedly escalated his campaign, mailing two pipe bombs in January 2007 to two separate investment companies, including a threatening letter with each pipe bomb. Although the pipe bombs were functional, the firing circuit was not fully connected as Defendant had not attached one wire in each bomb.

As Judge Lindberg previously found, the Government's evidence that Defendant poses a serious risk to the community if released is significant. The Government contends that Defendant committed this offense over a period of almost two years, during which time he had ample opportunity to reflect on his conduct and conform his behavior to the law. Yet the allegations are that Defendant repeatedly used threats of violence in an effort to deal with financial difficulties. Then, when threatening letters proved insufficient, Defendant escalated his behavior, sending actual pipe bombs to his victims with threatening letters. Moreover, the evidence found pursuant to the search warrants indicates that Defendant knew how to manufacture bombs and that he was doing the planning not from a manufacturing facility, but rather from his home and personal storage units. Thus, not only has Defendant failed to demonstrate that the Government is to blame for much of the delay in this case, he also fails to overcome the seriousness of the charges and the strength of the Government's evidence

concerning his dangerousness if released.  While the record appears not to support a finding that Defendant is a flight risk, this Court agrees with Judge Lindberg's prior assessment that Defendant continues to pose a danger to the community that cannot be sufficiently curtailed if he is allowed to await trial at home.[3]

**B.      Speedy Trial Act**

Defendant also contends that he is entitled to release under 18 U.S.C. § 3164[4], which provides, in relevant part,

(a)  The trial or other disposition of cases involving—

(1)  a detained person who is being held in detention solely because he is awaiting trial * * * *

(b)  The trial of any person who is being held in detention solely because he is awaiting trial shall commence not later than ninety days following the beginning of such continuous detention * * * * The periods of delay enumerated in section 3161(h) are excluded in computing the time limitation specified in this section.

(c)  Failure to commence trial of a detainee as specified in subsection (b), through no fault of the accused or his counsel * * * shall result in the automatic review by the court of the conditions of release.  No detainee * * * shall be held in custody pending trial after the expiration of such ninety-day period required for the commencement of his trial.

18 U.S.C. § 3164.

Two general categories of time are excluded from the computation of time under § 3164—(1) periods of delay excluded by § 3161(h) of the Speedy Trial Act, and (2) time attributed to the fault of the accused or his counsel.  See also *United States v. Adams*, 2006 WL 3842167, at *5 (S. D. Ill. Dec. 22, 2006); *United States v. Boyd*, 1992 WL 70321, at *4 (N.D. Ill. Mar. 10, 1992) (the excludable time periods in § 3161(h), including §§ 3161(h)(1)(F) and

---

[3]   As the Court previously has stated, it will make every effort consistent with the MCC policies and procedures to facilitate Defendant's trial preparation efforts.

[4]   Defendant made clear in open court and in his motion for reconsideration (as well as his reply brief) that he is not moving to dismiss the indictment in this case for violations of 18 U.S.C. § 3161.

(h)(8)(A), are specifically applicable to a preventatively detained defendant). The second exclusionary period—time attributed to the fault of the accused or his counsel—appears to make the statutory exclusion under § 3164 broader than the statutory exclusions under § 3161(h), which contain no such language. In essence, the second exclusionary period is akin to the concept of judicial estoppel, which prohibits a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase. *Cf. Zedner v. United States*, 547 U.S. 489, 504 (2006) (declining to apply the doctrine of judicial estoppel when a defendant moved to dismiss on the basis of Speedy Trial Act violations but not addressing § 3164(c)'s "fault" language). In the context of § 3164, this would prohibit a defendant from, among other things, seeking a continuance under the Speedy Trial Act, obtaining that continuance, but then arguing that it should not have been granted for the purpose of calculating the 90-day period.

In his motion, Defendant identifies two types of delays that he claims were not properly excluded under the Speedy Trial Act: (1) the 146 days following his arrest and indictment; and (2) the exclusion of time for pretrial motions.

### 1. The time between arrest and indictment

Defendant maintains that the time between his arrest and indictment was not properly excluded under § 3164. However, with respect to the time between his arrest on a criminal complaint and his indictment, that time period is not counted under § 3164, which applies, in this context, to a person who is being "held in detention *solely* because he is awaiting trial."[5] 18

---

[5] Here, Defendant was arrested on a criminal complaint. When a defendant is arrested and charged with a felony on a criminal complaint, he is not "awaiting trial" on that charge. Rather, Defendant is awaiting further proceedings in the district court, which only follow after an indictment or information is filed against the defendant. Thus, the time period between Defendant's arrest on a criminal complaint and the time of his indictment is not computed under the 90-day clock of § 3164, but rather under the 30-day clock set forth in 18 U.S.C. § 3161(b).

U.S.C. § 3164(a)(1) (emphasis added). Instead, that time period is governed by 18 U.S.C. § 3161. The Speedy Trial Act requires that the Government "return an indictment, move to dismiss the complaint or seek an extension of time to indict within thirty days after arrest." See *United States v. Ousley,* 100 F.3d 75, 76 (7th Cir.1996) (citing 18 U.S.C. § 3161(b)). "The Act also allows the district court to exclude certain periods of time from the computation of delay." *Ousley,* 100 F.3d at 76 (citing *United States v. Leiva,* 959 F.2d 637, 640 (7th Cir.1992)). A defendant complaining of erroneous time exclusion must make a showing of "actual prejudice." *Ousley,* 100 F.3d at 76.

In his motion, Defendant contends that "[w]hile there is a legitimate argument for dismissing the indictment in this case for violating 18 U.S.C. § 3161, I will reserve that argument for another day." Thus, Defendant has not presented a proper argument regarding his pre-indictment detention under § 3161. Nevertheless, the Court briefly addresses his detention in light of § 3161. A review of Defendant's pre-indictment timeline does not demonstrate error or prejudice. Defendant did not oppose the two extensions of time sought by the Government, which were granted by the Chief Judge. Furthermore, even if the extensions had been improper, Petitioner would have to demonstrate actual prejudice from the delay, which he has not done.

Even assuming that the time period prior to Defendant's indictment is counted under § 3164, at most 17 days were not excluded by the provisions of § 3161(h). On April 25, 2007, Defendant was arrested and had his initial appearance. That same day, the Government moved to detain Defendant on the grounds that he was a risk of flight and a danger to the community. As a result of that motion, time was excluded under § 3161(h)(1)(F) "from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." On April 30, 2007, the magistrate judge granted the Government's motion and Defendant was

ordered detained pending further proceedings in the district court.  As a result of that ruling, the

exclusion of time under § 3161(h)(1)(F) no longer applied and the 90-day clock would have

begun to run (again assuming that § 3164 is applicable to pre-indictment detention).  The clock

would have run until May 17, 2007, an elapsed time of 17 days, when the Government filed an

unopposed motion for an extension of time in which to seek an indictment in this matter.  That

same day, Chief Judge Holderman granted the motion and excluded time under § 3161(h)(8) (the

interests of justice exception) through August 23, 2007.  On August 9, 2007, the Government

filed another unopposed motion for an extension of time to seek an indictment.  That same day,

Chief Judge Holderman granted the motion and excluded time under § 3161(h)(8) (the interests

of justice exception) through September 22, 2007.  On September 18, 2007, the grand jury

returned an indictment against Defendant.

In sum, the best-case scenario for Defendant is that time was properly excluded under §

3161(h) for all but 17 days of the time between Defendant's arrest and his indictment.  Thus,

assuming that § 3164 applies to pre-indictment detention, only 17 days were not excluded (as

opposed to the 146 days claimed by defendant).

### 2. *Exclusion of time for the preparation of pre-trial motions*

Defendant next contends that the district judge previously assigned to this case

improperly excluded time for the preparation of pretrial motions, resulting in countless days

being improperly excluded from the 90-day period proscribed by § 3164.  As an initial matter,

Defendant, through his counsel, requested each of the continuances for pre-trial motions about

which he now complains.  Consequently, Defendant cannot establish that the time he has spent in

custody without trial commencing was "through no fault of the accused or his counsel."  18

U.S.C. § 3164(c); *United States v. Lemon*, 550 F.2d 467, 470 (9th Cir. 1977) (noting that "when

a continuance is granted at the request of the defense, such a delay is the 'fault of the accused or his counsel under § 3164(c) and excludable as such from the calculation of the 90-day period'"); *United States v. Martinez*, 538 F.2d 921, 923-24 (2d Cir. 1976) (holding that defendants were not entitled to release from incarceration under § 3164(c) where defendants were at fault for delay in not filing timely pre-trial motions and in consuming additional time during pre-trial proceedings); see also *United States v. Adams* 625 F.3d 371, 379 (7th Cir. 2010) (each of the extensions of time to file pretrial briefs was "granted at the request of [defendant's] own counsel, which casts doubt on the validity of his subsequent contention that he was deprived of his statutory right to a speedy trial."); *cf. United States v. O'Connor*, 2011 WL 3849624, at *12 (7th Cir. September 1, 2011).

In support of his argument, Defendant cites the Supreme Court's recent decision in *Bloate v. United States*, 130 S.Ct. 1345 (2010). In *Bloate*, the Supreme Court held that delays attributable to the preparation of pre-trial motions are not *automatically* excluded under § 3161(h)(1)(D). 130 S.Ct. at 1349. However, the Supreme Court further explained that such delays are excludable under the Speedy Trial Act if the district court makes a finding under the ends of justice exception set forth in § 3161(h)(7). *Id.* at 1357-58. Although the better practice is for the district court to put these findings on the record contemporaneously with the exclusion of time, the Supreme Court also has made clear that the Speedy Trial Act does not require that these findings be made contemporaneously with the exclusion of time, so long as the findings were made, "if only in the judge's mind, before granting the continuance." *Zedner v. United States*, 547 U.S. 489, 507 (2006); accord *Adams*, 625 F.3d at 380. The district court can subsequently put these findings on the record prior to ruling on a defendant's motion. See *Zedner*, 547 U.S. at 506-07 ("Although the Act is clear that the findings must be made, if only in

the judge's mind, before granting the continuance * * * the Act is ambiguous on precisely when those findings must be 'se[t] forth, in the record of the case.' However this ambiguity is resolved, at the very least the Act implies that those findings must be put on the record by the time a district court rules on a defendant's motion to dismiss under § 3162(a)(2))"; accord *United States v. Napadow*, 596 F.3d 398, 405 (7th Cir. 2010) ("[T]he district court need not explain its findings contemporaneously with its decision to exclude time."); *United States v. Bryant*, 523 F.3d 349, 361 (D.C. Cir. 2008) ("*Zedner* permits trial judges to put their findings on record at the time they rule on a [Speedy Trial Act] motion to dismiss, rather than at the time they grant the continuance * * *.").

A review of the procedural history of this case illustrates that the appropriate reasoning was applied (and corresponded with the ends of justice exception to the Speedy Trial Act) before Judge Lindberg granted each of Defendant's motions for extensions of time to file pretrial motions. Defendant was indicted on September 18, 2007, and arraigned on September 27, 2007. (Although not identified by Defendant, the time period between indictment and arraignment appears not to have been excluded under the Speedy Trial Act; consequently, 9 days may well have run off the 70-day clock under § 3161 and the 90-day clock under § 3164.) At the September 27, 2007 arraignment, the magistrate judge set the pretrial motion schedule and, based on the minute order, excluded time through the first status date on November 7, 2007, under § 3161(h)(1)(F), which was the provision that then governed the preparation of pretrial motions. The minute order does not reflect whether the magistrate judge considered the ends of justice exception at that time. The Government represents that it has not ordered the transcript from the arraignment, and, for purposes of this § 3164 motion, assumes that the magistrate judge did not

consider the ends of justice exception at that time. As a result, time would not have been automatically excluded under § 3161(h)(1)(F) and *Bloate*.

The minute order also does not reflect that Defendant or his counsel objected to the exclusion of time under the Speedy Trial Act. And, it seems reasonable that granting a continuance for pretrial motions would be in the interest of justice at an early juncture of a complex case. But even if that were not so, only 21 days would have run off of the 90-day clock under § 3164 before the next properly excludable event occurred.

On October 18, 2007, the Government filed a motion to have this case declared complex and to exclude time under the applicable ends of justice exception to the Speedy Trial Act—specifically, § 3161(h)(8)(A). As a result of that motion, time was excluded under § 3161(h)(1)(F) "from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." The Government based its motion on a number of factors, including: (a) that the indictment resulted from a massive nationwide investigation involving over a hundred different investigators from multiple law enforcement agencies in multiple jurisdictions; (b) that the offense was factually and legally complex, involving securities fraud, extortion, and firearms violations; and (c) that the Government had already produced over 600 pages of discovery but anticipated producing many thousand additional pages. As a result, the Government requested that the date for the Rule 16.1 conference be extended to November 16, 2007, and that the deadlines for pretrial motions be adjusted appropriately. The Government further requested that the case be declared complex and that time be excluded on that basis under § 3161(h)8)(B)(ii).

On October 31, 2007, the Court granted the Government's motion, declared the case complex, and excluded time under § 3161(h)(8)(A) (the ends of justice exclusion) through the

next status on November 29, 2007. The Court did not set a briefing schedule at that time. On November 29, 2007, the Court conducted a status and set a briefing schedule on pretrial motions, which were now due by January 28, 2008. The Court set the next status for March 19, 2008, and excluded time until that date for the filing of and ruling on pretrial motions, pursuant to § 3161(h)(1)(F). Although the minute order does not make any reference to § 3161(h)(8)(A) (the ends of justice exclusion), it seems clear that the previous judge excluded time on that basis, especially when the November 29, 2007 order is considered in the context of the case, and, in particular, the October 31, 2007 order declaring the case complex. Indeed, over the course of the next year, the Court granted nine additional requests by Defendant to extend time to prepare and file pre-trial motions. In those motions, Defendant specifically referenced the complexity of the case four times (see docket entries 30, 40, 72, and 76) and explained in detail why the extensions were needed to prepare and file the pretrial motions in the other five motions (see docket entries 44, 66, 69, 80, and 85).

During this time period, Defendant also changed lawyers (in March 2008), which required new counsel to review thousands of pages of discovery to get up to speed. This also is an appropriate basis for the previous judge to have excluded time under the ends of justice exception—a basis implicit in the Court's exclusion of time on March 6, 2008, the day on which the Court granted Defendant's first motion for new counsel. Furthermore, during this time, Defendant also brought a renewed motion for bond, which required litigation before the magistrate judge and previous district judge. The time necessary to resolve those proceedings also was properly excluded.

Thus, although Judge Lindberg cited only § 3161(h)(1)(F) in a number of the minute orders granting Defendant's motions for additional time to file pretrial motions, it is clear from

the context of the case—including the October 31, 2007 order and the facts set forth in Defendant's motions—that the Court surely had in mind ("if only in the judge's own mind") the ends of justice in granting the continuances and excluding time. This is sufficient for purposes of the Speedy Trial Act. See *Adams*, 625 F.3d at 380 ("The content of [defendant's] motions, coupled with the court's orders granting those motions and, with respect to the October 19 order, the court's subsequent elaboration of its rationale, reveal the relevant grounds for the continuances and are sufficient to comply with section 3161(h)(7) * * * * Nor is lack of express mention of the factors set forth in section 3161(h)(7)(B) fatal to the excludability of the continuances; * * * [the Speedy Trial Act] does not require that the court recite the statutory factors or make findings as to each of them on the record"). And, as mentioned previously, specifically for purposes of a § 3164 analysis, the fact that Defendant requested each of these extensions of time renders each of the resulting periods of delay attributable to Defendant and his counsel in any event, and thus does not support a § 3164 violation.

At the end of the day, the Speedy Trial Act does not condition the exclusion of time on particular docket entries. Rather, it allows excludable time for continuances made for the right reasons and with the right findings placed on the record at or before the time that the Court rules on a defense motion predicated on an alleged STA violation. Here, based on the Court's review of the record—particularly given the complexity of the case, the numerous requests to change counsel, the ultimate decision to proceed *pro se*, and the fact that Defendant and counsel requested all the extensions of time that were logged under § 3161(h)(1)(F)—it is clear that time was excluded for the right reasons and with the right findings.

Thus, based on the foregoing analysis, even if Defendant's pretrial detention counted toward the ninety-day clock (17 days) and even if the magistrate judge's exclusions of time

under § 3161(h)(1)(F) at the initial arraignment also counted (21 days more days), then an additional 38 days would be added to the nine days which were not properly excluded for the time period between indictment and arraignment, for a total of 47 days. Even under the most generous calculation, because less than 90 days have expired, Defendant is not entitled to bail under § 3164(c). In sum, taking into account (1) the time properly excluded under § 3161(h) (see § 3164(b)) and (2) the time attributable to the "fault of the accused of his counsel" (§ 3164(c)), Defendant falls short of the 90 days.

* * *

In sum, the Court concludes that Defendant Tomkins is not entitled to release pending trial. The majority of the delays in bringing this case to trial are of Defendant's own doing— whether by requesting additional time to prepare pretrial motions, filing numerous dispositive motions and appealing various rulings, or frequently changing counsel and then deciding to proceed *pro se*. Furthermore, at recent status conferences, Defendant has specifically opted for the later of the two proposed time frames for trial, acknowledging that he did not feel that he could be ready to go to trial until April 2012. Although Defendant seeks to be released to better prepare for trial, the decision to go *pro se* was entirely his own. The delay occasioned by a *pro se* criminal defendant having to prepare for trial without the assistance of counsel certainly seems to fall within the ambit of § 3164(c)'s cautionary language about delays being the "fault of the accused or his counsel."

Finally, the Court notes the obvious difficulty in a second judge deciphering the circumstances – including the mind set of the previously assigned judge – at the time that a prior continuance was granted. However, it seems clear from the record in this case that the time previously excluded for pre-trial motions easily could have been excluded under the ends of

justice exception, given (1) the complexity of the case, (2) the fact that Defendant requested each of these extensions, (3) the numerous significant (even dispositive) issues briefed by the parties, (4) the appeals taken by Defendant, and (5) Defendant's numerous decisions to change counsel. Thus, the Court concludes that the delay was properly excluded and adequately supported by the record before the district judge at the time that the exclusions were made. See *Zedner*, 547 U.S. at 506-07; *Napadow*, 596 F.3d at 405; *Bryant*, 523 F.3d at 361.

## III.    Conclusion

For the reasons stated throughout this order, the Court respectfully denies Defendant John Tomkins's motion for reconsideration of detention order [205]. In view of that ruling, Defendant's further motion for status hearing to set the terms of release, which has not yet been docketed, is likewise denied.

Dated:  October 12, 2011

_____
Robert M. Dow, Jr.
United States District Judge