**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 07 CR 227 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| JOHN TOMKINS, | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are several motions filed by the parties in anticipation of trial. The Court's rulings are set forth below and are to be construed in a manner consistent with the rulings made or forecasted by the Court during the final pre-trial conferences in this matter.

**I.      Motions**

**A.      Bill of Particulars [288]**

Defendant has filed a motion for a bill of particulars [288]. He argues that the indictment charges him with "mail[ing] or caus[ing] to be mailed" threatening communications and "does not indicate whether [he was] the author or not" of the threatening communications. Defendant contends that in light of these alternative theories of criminal liability, he needs to know additional details to prepare his defense.

Defendant is not entitled to a bill of particulars in these circumstances. The indictment provides Defendant with sufficient information apprising him of the charges that he is facing, and the voluminous discovery produced to Defendant further informs him about the evidence against him and the Government's likely theories of the case. Under the pertinent case law, the Government need not disclose its exact theory (or theories)—i.e., whether the Government intends to try to prove that Defendant himself mailed or typed the threatening letters or aided and abetted another individual in the commission of the charged offenses. Indeed, the Government

1

may attempt to prove both theories at trial. See, *e.g.*, *United States v. Concepcion*, 983 F.2d 369, 392-93 (2d Cir. 1992) (explaining that the government may attempt to prove multiple theories at trial provided that it has provided the defendant with adequate notice of those theories); see also *United States v. Davis*, 2000 WL 290302, at *1 (7th Cir. 2000) ("even when alternative theories of liability have been charged in the conjunctive, only one theory must be proved") (citing *United States v. Martin,* 63 F.3d 1422, 1428 (7th Cir. 1995); *United States v. LeDonne,* 21 F.3d 1418, 1427 (7th Cir. 1994)).

In sum, where, as here, the indictment includes (i) the elements of each offense charged, (ii) the time and place of the defendant's conduct constituting the violation, and (iii) a citation to the statute or statutes violated, and the Government also has provided the necessary discovery to Defendant to defend against either theory, a bill of particulars is not necessary. See, *e.g.*, *United States v. Blanchard*, 542 F.3d 1133, 1140 (7th Cir. 2008) ("[T]he key question is whether the defendant was sufficiently apprised of the charges against him in order to enable adequate trial preparation."); *United States v. Hernandez*, 330 F.3d 964, 975 (7th Cir. 2003) (explaining that a bill of particulars is not necessary in cases in which the indictment sets out the elements of the charged crimes and provides sufficient notice of the charges to enable the defendant to prepare his defense. Accordingly, Defendant's motion for a bill of particulars [288] is denied.

## B.    Defendant's Fourth Motion for Discovery [306]

For the reasons stated on the record at the previous pre-trial conferences held on March 28 and April 10, the Court has granted Defendant's fourth motion for discovery [306] and Defendant's emergency motion [321]. Since the March 28 conference, Defendant has been given additional access to evidence at the storage facility and has received photocopies of

additional documents that he requested from among the materials that were seized from him that remain in the Government's possession because they are potentially relevant at trial.

### C.     Defendant's Motion in Limine [304]

Defendant's seven-part motion in limine [304] is granted in part and denied in part consistent with the following:

#### 1.     Use of Inflammatory Words

As explained on the record at the April 10 pre-trial conference, Defendant's motion is granted to the extent that it relates to the words "terrorist" and "terrorism." The Government has not charged Defendant with being a "terrorist" or with engaging in "terrorism." Counsel for the Government may not use either word in reference to Defendant in their opening statements, closing arguments, or in framing questions to witnesses.

#### 2.     Name Calling

Defendant's motion is granted in part and denied in part. The Government has acknowledged its obligation to act professionally and not in any way that is unfairly prejudicial to Defendant. Except as explained below, Government counsel should refer to Defendant as "Defendant" or "Mr. Tomkins." The exception is that the Government may elicit testimony designed to establish Defendant's involvement in creating certain letters that were signed by "The Bishop." The Government alleges that Defendant signed many of the letters that he sent as "The Bishop" – a moniker that the Government has alleged in the title block of the superseding indictment to be Defendant's alias. The Government further contends that Defendant took significant steps to conceal his identity from his victims and that at least some of the Government's witnesses only know Defendant as "The Bishop." These allegations make it fair game for the Government, which bears the burden of proof beyond a reasonable doubt, to try to

establish that Defendant and "The Bishop" are one and the same person and to make references to that theory of the case during opening statements, witness examination, and closing arguments, to the extent necessary but no more.

### 3. Comments by Government about Defendant's Pro Se Status

Defendant's motion is granted. If Defendant does represent himself at trial – as currently appears will be the case – neither he nor the Government may call undue attention to that fact by commenting on it to the jury. Within the limitations discussed on the record at the pre-trial conferences (pertaining to Defendant's anticipated appropriate behavior and the prohibition on "hybrid" representation), Defendant has a right to represent himself at trial. Both this Court and Judge Lindberg have exhaustively explained and explored the subject with Defendant to ascertain his wishes and his knowing and voluntary waiver of his right to counsel. Defendant has highly capable stand-by counsel to assist him within the bounds of the rule against "hybrid" representation. Defendant's role in representing himself will be evident to the jury, but there is no need for either side to belabor or call additional attention to the matter. To the extent that either side believes that an issue at trial may require some guidance from the Court (or stand-by counsel) on account of Defendant's pro se status, Defendant and Government counsel are directed to request a side bar, where the issue can be discussed outside the presence of the jury.

### 4. Right Not to Testify

Defendant's motion is granted. Defendant has a right not to testify and the Government has properly acknowledged that it will not comment about Defendant's decision not to testify, should that be his choice.

### 5.       No Hypothetical Questions

Defendant's motion is denied without prejudice to renewal on an issue-by-issue basis during trial.  As the Court explained at the pre-trial conferences, because hypothetical questions are permissible in some circumstances, the Court must reserve ruling until a concrete question is posed.  With that said, neither side is permitted to use a hypothetical in an attempt to arouse undue sympathy or ask jurors to put themselves in the victims' shoes or Defendant's shoes.  However, jurors are allowed to use common sense and rely on life experiences during deliberations.

### 6.       Exclusion of Potential Witnesses

Defendant's motion is granted.  Consistent with Federal Rule of Evidence 615, potential witnesses are excluded from the courtroom.  The exceptions are Defendant and the Government's representative.  Government counsel has represented that its representative is likely to be Case Agent Jason Weber.  In the event that it is not Mr. Weber, the Court requests that the Government advise the Court and Defendant promptly.

### 7.       Use of Electronic Devices

Defendant's motion is denied for the reasons stated on the record during the pre-trial conference.  The Government bears the burden of proof and is entitled to use laptops and other computers and electronic devices to present its case.  Furthermore, showing the jury the computers found by law enforcement at Defendant's home and the files found on those computers is relevant and probative evidence that ties Defendant to the crimes charged.  The use of these devices will aid in jury comprehension.  They also may be of use to Defendant should he wish to call up Government exhibits in cross-examination or even in his case-in-chief should he present one.

**D.      Defendant's Fourth Motion for Return of Seized Property [312]**

Defendant's fourth motion for the return of seized property [312] is denied without prejudice.  Based on the discussions at the pre-trial conferences, the Court understands that the materials seized from Defendant that remain in the Government's possession at this time are potentially relevant at trial.  To the extent that other property belonging to Defendant has not been returned yet, he should raise the issue with Magistrate Judge Schenkier.

**E.      Government's 404(b) Notice and Motion for Admissibility of Evidence per FRE 404(b) [301]**

The Government has filed a Rule 404(b) notice and a motion for admissibility of evidence pursuant to Rule 404(b).  The Government argues in the alternative that the evidence that is subject to its Rule 404(b) motion is admissible (1) as direct evidence of the offenses charged and (2) at a minimum, under Rule 404(b).  The Court reserves ruling on exactly what portion of the evidence identified in the motion is direct evidence as opposed to evidence that may be used for a particular purpose under Rule 404(b).  See, *e.g.*, *United States v. Miller*, --- F.3d ---, 2012 WL 763151 (7th Cir. Mar. 12, 2012) (finding that evidence of the defendant's recent possession of the same gun was directly relevant evidence of the charged crime, not propensity evidence); see also *United States v. Gorman*, 613 F.3d 711, 718-19 (7th Cir. 2010).  Those judgment calls will be easier to make after the Court has heard opening statements and begins to see the presentation of the evidence at trial – and the Court will endeavor to provide further guidance as early as possible in the trial.  To the extent that the evidence is admissible only under Rule 404(b), limiting instructions will be necessary; the Court will work with the parties on fashioning appropriate instructions.  For pre-trial purposes, however, the ruling is that the evidence identified in the Government's motion likely is admissible as directly relevant evidence of the crime charged and, in any event, at least under Rule 404(b).

Defendant John Tomkins is charged with mailing ten threatening letters, including two pipe bombs, between May 2005 and January 2007. Aside from these ten mailings, the Government alleges that Defendant sent nine additional letters to individuals throughout the United States. Also, during a search of Defendant's storage lockers in April 2005, law enforcement officers found two additional pipe bombs that they contend were constructed in substantially the same way as the explosive devices that Defendant allegedly mailed in January 2007. The Government has moved for the admissibility of the nine uncharged letters, the two additional explosive devices, and testimony concerning the evidence.[1]

With respect to the direct evidence inquiry, "[t]he Federal Rules of Evidence do not limit the government to the 'most' probative evidence; all relevant evidence is admissible and the Rules define relevance broadly as evidence 'having any tendency to make the existence of any fact * * * more probable or less probable.'" *U.S. v. McKibbins*, 656 F.3d 707, 711 (7th Cir. 2011) (citing Fed. R. Evid. 401 and 402). Direct evidence of a crime "is almost always admissible against a defendant." See *United States v. Gorman,* 613 F.3d 711, 717 (7th Cir. 2010). In determining whether a matter is direct evidence of guilt, or rather is "other bad acts" evidence governed by Rule 404(b), courts look to the scope of the indictment itself. See *United States v. Alviar,* 573 F.3d 526, 538 (7th Cir. 2009). "When evidence is embraced by the [allegations] in the indictment, the court need not resort to Rule 404(b) analysis." *Id.*

The evidence sought to be admitted by the Government appears to meet this "broad standard" (*McKibbins*, 656 F.3d at 711) as it relates directly to the allegations in the indictment, and assists in telling the story of how the Government contends Defendant carried out the charged conduct. See also *infra* pp. 9-12. Furthermore, under Rule 403, the Court does not

---

[1] The Government indicated during the pre-trial conference on April 10, 2012, that it is not likely to use the 3COM letters referenced in its motion.

believe the evidence to be unfairly prejudicial. See Fed. R. Evid. 403 (district court should exclude evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").[2] While this evidence is somewhat cumulative, the uncharged letters are separate drafts, most of which were sent on separate dates (although close in time to the charged letters), and will help the jury piece together the progression of Defendant's alleged scheme. The bombs also could be viewed as cumulative, but again, their existence seems to make it more likely that Defendant knew how to construct such devices. This evidence is probative and, in the Court's estimation, not *unfairly* prejudicial to Defendant.

In the event that the Court determines at trial that any portion of the evidence that the Government seeks to introduce is *not* direct evidence of the charged scheme, the Court provides the following guidance on the Government's alternative request that the evidence be admitted under Rule 404(b). "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but such evidence may be introduced "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2); see also *United States v. Reese*, 666 F.3d 1007, 1016–17 (7th Cir. 2012); *United States v. Baker*, 655 F.3d 677, 680–82 (7th Cir. 2011) (evidence of prior, uncharged drug sales admissible in a drug distribution trial); *United States v. Ellis*, 548 F.3d 539, 544 (7th Cir. 2008) (prior tax violations admissible to show wilfulness and to rebut forgetfulness defense). Courts consider a four-part test in assessing the admissibility of evidence under Rule

---

[2] Although Defendant does not present a Rule 403 objection to using this evidence as direct evidence, the Court likely "still [has] an obligation to evaluate the evidence under Rule 403," as it does when it conducts the Rule 404(b) analysis. *McKibbins*, 656 F.3d at 712.

404(b): (i) whether the evidence helps to establish a matter in issue other than the defendant's propensity to commit the crime charged; (ii) whether the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (iii) whether the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (iv) whether the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Reese*, 666 F.3d at 1015; see also *United States v. Foster*, 652 F.3d 776, 784–85 (7th Cir. 2011).

With respect to the uncharged letters, Counts One through Ten of the Superseding Indictment charge Defendant Tomkins, on ten separate occasions, with intent to extort from a person a thing of value. The Government specifically alleges that Defendant knowingly deposited and caused to be delivered communications containing a threat to injure the person of the addressee and of another. The Government maintains that the nine uncharged letters will help prove Defendant's plan, intent, and motive to extort a thing of value (e.g., increased value of Defendant's stock holdings) providing the full context in which the threats occurred over a two year period. The Government also contends that the nine uncharged letters also will help prove identity – that is, that Defendant was in fact the person who sent the charged letters and pipe bombs – because of the similarities between the charged and uncharged letters and other evidence recovered from Defendant's home and storage lockers linking Defendant to both the charged and uncharged letters.

According to the Government, Defendant purchased, on multiple dates, long options in both 3COM and Navarre. The Government maintains that a comparison of the exercise dates of those long options to the dates on which the charged and uncharged threatening letters were mailed, and the deadlines for the recipients' actions contained therein, provide context for

Defendants' overall plan, motive, and intent to extort things of value by mailing the threatening communications. For example, the Government alleges that Defendant purchased long options in 3COM on at least 18 occasions between February 7, 2005, and September 19, 2005. All of those options had an exercise date of January 2007. The Government alleges that Defendant sent five threatening letters to five different investment advisors relating to 3COM, all of which threatened the recipient and/or the recipient's family with death or injury if the price of 3COM did not increase to $6.66 by October 31, 2005. The first letter (which is charged) was sent on May 23, 2005, the second letter (which is charged) was sent on September 7, 2005, and the third, fourth, and fifth letters (one of which is charged) were sent on October 25, 2005. Had the price increased to $6.66 by October 31, 2005, Defendant's holdings in 3COM long options would have increased in value. Similar allegations exist for Defendant's purchase of long options in Navarre on at least 19 occasions between March 9, 2006, and January 29, 2007.

Viewed in this context, the uncharged letters, relating to both 3COM and Navarre, are clearly relevant to the Government's attempt to establish Defendant's plan, intent, and motive because they were sent to multiple investment advisors and a Navarre executive, with the same threats to kill or injure if the recipient did not take action to increase the price of 3COM's and/or Navarre's stock by the listed dates. Under the Government's theory of the case, by sending these threatening communications to multiple investment managers, as well as a high-ranking Navarre executive, Defendant was attempting to give his scheme the best chance of success. Because of this, these uncharged letters are evidence that Defendant intended to extort a thing of value—artificially inflated stock prices, which would have increased the value of his stock holdings. Such evidence is admissible under Rule 404(b)(2). See *United States v. Albiola*, 624 F.3d 431, 439 (7th Cir. 2010) ("'When a defendant is charged with a specific intent crime, the government

may present other acts evidence to prove intent.'") (quoting *United States v. Perkins*, 548 F.3d 510, 514 (7th Cir. 2008)).

Furthermore, the three uncharged March 13, 2006 letters to the investment advisors are identical in language, reflect the same language and structure as the previous 3COM letters, including threatening the recipients and their families if the recipients did not take actions to artificially inflate the price of Navarre stock by May 1, 2006, and all end with the phrase "TIC TOC." Defendant subsequently mailed, on June 9, 2006, additional letters (all of which are charged) to those same three investment advisors, which begin with the phrase "TIMES UP" and make additional threats against the recipients and their families if the price of Navarre stock was not artificially inflated by June 13 through June 17. These letters are all signed "THE BISHOP." The three uncharged March 13, 2006 letters to the investment advisors, which imposed a deadline (May 1, 2006) that had passed, put in context and explain the "TIMES UP" reference at the beginning of the June 9, 2006 letters to those same investment advisors.

The uncharged letters also are relevant because they may be used to help establish Defendant's identity as the person who wrote and mailed each of the charged letters through: (1) the similar and/or identical language used in each the letters, and (2) evidence recovered from Defendant's home and storage lockers, which shows that Defendant had (a) handwritten notes reflecting the names and addresses of each of the charged and uncharged victim-recipients, (b) typed documents reflecting the names of some of the charged and uncharged victim-recipients, and (c) notes reflecting research on some of the investment companies at which some of the victim-recipients worked. Viewed together, this evidence is pertinent to the Government's case because, if accepted by the jury, it helps identify Defendant as the person who wrote and mailed each of the charged letters. This is a proper, non-propensity purpose within the meaning of Rule

404(b).  Particularly with respect to the uncharged letters, the Government is not merely "trying to prove the defendant is a 'bad guy'" or "flood the jury" with unnecessary evience.  *McKibbins*, 656 F.3d at 707.  Rather, the Government is trying to prove the charged conduct by giving the jury a complete picture of what went on.[3]

Evidence relating to the uncharged mailings also is similar enough and close enough in time to be relevant to the matters at issue.  The nine uncharged letters are substantially the same as the letters charged in the Superseding Indictment.  Among other things, they begin with the phrase "Life is full of choices," threaten the recipients, instruct the recipients on stocks to purchase, and warn the recipients not to alert law enforcement.  The uncharged letters also are close in time to the letters charged in the Superseding Indictment.  Each of the uncharged letters was mailed during the two-year period in which Defendant allegedly engaged in his scheme, and each of the uncharged letters was mailed after the first charged letter was mailed (on May 23, 2005) and before the pipe bombs were mailed in January 2007.

Finally, in regard to the balancing of the issues implicated by Rules 402 and 403, the probative value of the uncharged letters and accompanying testimony is substantial to proving Defendant's plan, intent, motive, and identity.  While admission of the uncharged devices will certainly be prejudicial to Defendant – indeed, all relevant evidence is prejudicial to a defendant in the sense that helps establish a defendant's guilt – as previously indicated, the Court does not believe that Defendant Tomkins will suffer *unfair prejudice* because of the admission of the letters.  To the extent that the evidence is admitted not as direct evidence, but rather under Rule 404(b), the Court will provide limiting instructions to the jury as these uncharged letters are admitted to help the jury understand which letters have been charged, which have not, and the

[3]  The uncharged bombs present slightly different considerations, which the Court addresses below in the 404(b) context and will also address in the direct evidence context as the Government seeks to use evidence of the bombs during the course of the trial.

extent to which the jury can rely on the uncharged letters in weighing the facts as presented. For these reasons, the probative value of these letters outweighs the prejudice that their introduction would cause.

With respect to the uncharged explosive devices, the Government seeks to use two items that it alleges are substantially similar to the explosive devices mailed to addresses in Kansas City and Denver, as charged in Counts Nine through Thirteen. The Government represents that the uncharged and charged devices have the following characteristics: (1) each device found in the storage locker was housed in U.S. Mail cardboard box; (2) each device found in the storage locker used substantially the same type of magnetic reed switch, manufactured by General Electric Company, and the switches were attached in such a way that, when the cardboard box lid was open, the switch was also open, thus preventing any electrical current from flowing through the bomb's circuitry; (3) each device found in the storage locker was powered by two batteries affixed end-to-end with each other by tape, and consisted of an Estes brand model rocket ignitor contained inside of a sealed length of PVC pipe, which was filled with explosive powder and shot shell pellets. The Government also intends to present evidence that the storage locker where the two uncharged devices were found was rented in Defendant's name and paid for out of Defendant's checking account.

The design, construction, and location of the two uncharged devices help establish the identity of Defendant Tomkins as the person who built, possessed, and then sent the two charged pipe bombs in January 2007. The devices further demonstrate that Defendant had the opportunity and ability to build the charged devices. Furthermore, the similar design, assembly, and apparent functioning of the storage locker devices, and their discovery in April 2007, just four months after the charged devices were mailed, makes the evidence of the storage locker

devices similar enough and close enough in time to be relevant to matters in issue. While admission of the uncharged devices will certainly be prejudicial to Defendant for the same reasons articulated with respect to the letters, at this time, the Court is not convinced that Defendant Tomkins will suffer *unfair prejudice* because of the admission of this evidence. However, as the trial plays out, the evidence of the uncharged bombs may prove at some point to be cumulative, and the Court acknowledges that "cumulative evidence can itself risk unfair prejudice under Rule 403." *McKibbins*, 656 F.3d at 713; see also *Old Chief v. United States*, 519 U.S. 172, 179-80 (1997) (noting that cumulative evidence can be unfairly prejudicial). If Defendant feels that is the case, he may raise an objection as the appropriate time.

In the interest of completeness, the Court also addresses Defendant's specific arguments. Defendant argues that the Government should be precluded from introducing the identified Rule 404(b) evidence because the Government opposed his motion for a change of venue to Iowa. However, opposing a motion for a change of venue does not preclude the Government from introducing relevant, material evidence under Rule 404(b). Instead, if such evidence satisfies the requirements of Rule 404(b), then such evidence is admissible to prove the charges in this case, irrespective of whether the uncharged conduct could have been charged here or elsewhere.

Defendant also argues that admitting evidence of the uncharged letters and uncharged pipe bombs "could lead the jury to make an emotional or irrational decision." [316 at 2.] However, the evidence is of the same nature and quality as the evidence supporting the charged mailings and charged pipe bombs. And, again, any evidence that is admitted under Rule 404(b) will be subject to a jury instruction that will explain to the jurors how they may consider the evidence—*e.g.*, that the jury should consider evidence of the uncharged mailings and uncharged

pipe bombs only to prove Defendant's identity, intent, plan, etc., with respect to the charges in the superseding indictment, but should not consider the evidence for an improper purpose.

Defendant next argues that the Court should deny the Government's Rule 404(b) notice because the proposed evidence is needlessly cumulative of the Government's other evidence. Defendant bases this argument on the fact that the Government noted in its Rule 404(b) notice that the two uncharged 3COM letters were mailed on the same date and from the same location as the letter charged in Count Three of the Superseding Indictment and on the fact that the text of the two uncharged 3COM letters is nearly identical to the text of the letters charged in Counts One and Two of the Superseding Indictment.

One of those factors in the four-part test is whether the other act is similar enough and close enough in time to be relevant to the matter in issue. *Id.* Questions about "'how similar is similar enough' * * * do not have uniform answers; these answers * * * depend on the theory that makes the evidence admissible, and must be reached on a case-by-case basis. Thus, similarity means more than sharing some common characteristics; the common characteristics must relate to the purpose for which the evidence is offered." *United States v. Torres*, 977 F.2d 321, 326 (7th Cir. 1992); see also *United States v. Vargas*, 552 F.3d 550, 555 (7th Cir. 2008) (explaining that courts "analyze whether the prior conduct is similar enough on a case-by-case basis, a determination that 'depend[s] on the theory that makes the evidence admissible'") (quoting *United States v. Wheeler*, 540 F.3d 683, 692 (7th Cir. 2008)). This is why such a high degree of similarity is required when Rule 404(b) evidence is offered to prove identity or *modus operandi* (see *United States v. Smith*, 103 F.3d 600, 603 (7th Cir. 1996)), while less similarity is required when such evidence is offered for other purposes (see *Wheeler*, 540 F.3d at 692). Here, the Government has offered the proposed Rule 404(b) evidence for multiple purposes, including

proving Defendant's identity. Accordingly, the high degree of similarity between the charged conduct and uncharged conduct is what courts require in such circumstances under the similarity prong of the Rule 404(b) analysis. Concerns related to the evidence being cumulative remain present, and the Court will be better able to address those concerns as the evidence is offered at trial.[4]

Finally, the Court notes that this case differs substantially from a recent Seventh Circuit decision addressing Rule 404(b) concerns. In *United States v. Miller*, --- F.3d ---, 2012 WL 763151 (7th Cir. Mar. 12, 2012), the Seventh Circuit held that use of the defendant's prior drug distribution conviction to prove intent was a "disguised use for impermissible propensity purposes." *Id.* at *1. The Court noted that "Rule 404(b) does not provide a rule of automatic admission whenever bad acts evidence can be plausibly linked to 'another purpose,' such as knowledge or intent, listed in the rule. The Rule 402 requirement of relevance and the unfair prejudice balancing inquiries of Rule 403 still apply with full force." *Id.* at *6; see also *United States v. Beasley,* 809 F.2d 1273, 1279–80 (7th Cir. 1987). If it were otherwise, the list of exceptions would engulf the principle behind the rule. The court then reminded district courts that Rule 404(b) requires a case-by-case determination, not a categorical one, and instructed

---

[4]   Defendant's response does not address the other uncharged conduct proffered by the Government. As explained in the Government's Rule 404(b) notice, there were three groups of uncharged letters: (1) the two uncharged 3COM letters; (2) the four letters mailed on March 13, 2006, relating to Navarre; and (3) the three July 17, 2006 letters mailed from Orlando. Three of the March 13, 2006, letters were mailed to investment advisors, threaten the recipients and their families if the recipients did not take actions to artificially inflate the price of Navarre stock by May 1, 2006, and all end with the phrase "TIC TOC." Defendant subsequently mailed, on June 9, 2006, additional letters (all of which are charged) to those same three investment advisors, which begin with the phrase "TIMES UP" and make additional threats against the recipients and their families if the price of Navarre stock was not artificially inflated by June 13 through June 17. Thus, three of the uncharged March 13, 2006, letters put in context and explain the "TIMES UP" reference at the beginning of the June 9, 2006 letters to those same investment advisors. The Court does not view this particular evidence as cumulative; rather, the evidence (similar in time and scope to the charged letters and bombs) bolsters the Government's theory that Defendant was engaged in a scheme to intent to extort things of value by mailing the threatening communications.

courts to "balance the relevance of the proposed use of the evidence to the case—and the evidence's relevance to that proof—against the high risk that the evidence will also tend to establish bad character and propensity to commit the charged crime."

Here, at this stage in the case, the evidence sought to be introduced appears directly relevant to the charged conduct—it helps identify Defendant as the perpetrator and also adds missing pieces to the puzzle of how he intended to extort things of value by mailing threatening communications. If the Court concludes that it is not direct evidence of the crimes charged, then the uncharged letters certainly help to identify Defendant as the perpetrator in a 404(b) sense and also demonstrate his plan with respect to approaching the executives and urging them to carry out his requests and his motive in sending the letters when he did, particularly when the uncharged letters are viewed in light of the charged letters.

**F.    Government's Consolidated Motions in Limine [302]**

The Government's ten-part motion in limine [302] is granted in part and denied in part consistent with the following:

**1.    Motion to Allow Testimony and Evidence Concerning Defendant's Securities Ownership and Motives for Mailing Threatening Communications**

Under Rule 702, "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise," so long as "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Rule 701, however, states that

> [i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. Subparagraph (c), which was added to Rule 701 in 2000, was intended "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 Advisory Committee's note to 2000 Amendments.

"Rule 701 permits lay witnesses to offer an opinion on the basis of relevant historical or narrative facts that the witness has perceived." *Certain Underwriters at Lloyd's, London v. Sinkovich,* 232 F.3d 200, 203 (4th Cir. 2000) (internal quotation marks omitted). The rule does not, however, "permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness. A critical distinction between Rule 701 and Rule 702 testimony is that an expert witness must possess some specialized knowledge or skill or education that is not in the possession of the jurors." *Id.* (citation and internal quotation marks omitted).

"The Rules do 'not distinguish between expert and lay *witnesses,* but rather between expert and lay testimony.'" *U.S. v. Christian*, --- F.3d ---, 2012 WL 7631777, at *5 (7th Cir. Mar. 12, 2012) (citing Rule 701 advisory committee's note (2000 amendments)). "Lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *Id.* (quotations omitted). The Seventh Circuit has differentiated between lay opinion that is limited to what the witness observed or "to other facts derived exclusively from [a] particular investigation" and an expert who brings "the wealth of his experience as an officer to bear on those observations and makes connections for the jury based on that specialized knowledge." See *id.*; see also *United States v. Fenzl,* 670 F.3d 778 (7th Cir. 2012); *United States v. Gaytan*, 649 F.3d 573, 579 n.1 (7th Cir. 2011). The line between expert and lay testimony is difficult to draw in cases where, as

here, "a witness with specialized * * * knowledge was also personally involved in the factual underpinnings of the case." *Christian*, 2012 WL 7631777 at *6 (quoting *United States v. White,* 492 F.3d 380, 401 (6th Cir. 2007)).  The inferences that witnesses draw when observing cannot always be separated from the expertise that they bring to evaluate those situations. Their observations are guided by experience and training and thus, at least some of their fact testimony will be influenced by this specialized knowledge.  In these instances, the witness may be qualified to "provide both lay and expert testimony in a single case." *See* Fed. R. Evid. 701, advisory committee's note (citing *United States v. Figueroa-Lopez,* 125 F.3d 1241, 1246 (9th Cir. 1997)).

Mr. Shute himself is a case in point.  As the Government notes, he has extensive experience in the financial markets, market surveillance, and market regulation.  For example, if the Government were to call upon him to render opinions about whether Defendant was successful or could have been successful in his scheme to extort victims into buying large blocks of 3COM and Navarre stock so that Defendant could make a profit by selling blocks of call options he purchased, such testimony would constitute expert opinion testimony and would be subject to the requirements of Federal Rule of Evidence 702.  But the Government represents that it plans to elicit no such testimony from Mr. Shute – and it appears that he could not provide any such testimony as a condition of his employment with the SEC in any event.

To the extent that the Government intends to elicit from Mr. Shute testimony about his personal knowledge and perceptions of the historical facts surrounding the relevant transactions, the testimony this would be appropriate fact witness testimony.  While he appears to have particularized knowledge that he learned through his job(s), this knowledge does not automatically convert his lay testimony into impermissible expert testimony.  See *Bank of China*

*v. NBM LLC,* 359 F.3d 171, 181 (2d Cir. 2004) (concluding that bank employee assigned to investigate scheme by bank customers to defraud the bank could testify about the results of his investigation: "The fact that Huang has specialized knowledge, or that he carried out the investigation because of that knowledge, does not preclude him from testifying pursuant to Rule 701, so long as the testimony was based on the investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise in international banking. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his position in the business."); see also *U.S. v. Chapman*, 209 Fed. Appx. 253, 265-268 (4th Cir. 2006) (testimony of outside advisor to defendant's investment advisory firm, explaining what she meant by "fiduciary responsibility" in letter in which she recommended terminating a firm subadvisor, after he was indicted, was not expert testimony about defendant's fiduciary duties, but was instead testimony about historical or narrative facts, in prosecution for wire fraud, mail fraud, investment advisory fraud, and making a false statement to the Securities and Exchange Commission (SEC)). Thus, Mr. Shute may testify about summaries that he prepared of the data provided by Scottrade and Ameritrade concerning Defendant's investments in 3COM and Navarre as well as of data provided by the Chicago Board Options Exchange about the individuals who owned call options in 3COM on certain dates in 2005 and Navarre on certain dates in 2006 (assuming these individuals are the individuals that Defendant was allegedly threatening). He also may testify about the content of the documents that he reviewed in connection with his investigation.

This testimony is fact testimony even to the extent that it informs the jury as to the witness's state of mind as he made his observations relating to the factual record. However, Mr.

Shute's testimony must be limited to observations and facts "derived exclusively from [a] particular investigation," and cannot extend to connections [made] for the jury based on [any] specialized knowledge." See, *e.g.*, *Christian*, 2012 WL 763177 at *6 (explaining that testimony about how a defendant's hand positions raised concerns in officers was not expert testimony). Mr. Shute may not provide testimony which requires him to make connections for the jury based on that specialized knowledge. For instance, jurors are "presumably not well versed" in how financial markets, stocks, and options work (in general). See *id.* at *8. This sort of testimony is akin to how crack cocaine is packaged for distribution, an issue which has been determined to be an expert's province. See *United States v. Oriedo*, 498 F.3d 593, 603 (7th Cir. 2007) (holding that agent in *Oriedo,* who had found plastic baggies with the corners cut in defendant's hotel room, testified in expert capacity when informing the jury that this is how crack cocaine is packaged for distribution). Furthermore, the jargon of economics and markets typically is not within the ken of the average juror. See, *e.g.*, *United States v. York*, 572 F.3d 415, 423 (7th Cir. 2009) (case in which the witness translated code used by conspirators in the drug trade, where absent definitions of those terms, the jury could believe that conspirators were talking about some, non-criminal conduct). Thus, defining unfamiliar economic- or stock-based terms for the jury carries with it the imprimatur of expert testimony. See also *United States v. Farmer*, 543 F.3d 363, 369 (7th Cir. 2008) (affirming district court's decisions where an agent testified as a fact witness regarding the investigations progress and events and as an expert witness to assist the jury in understanding the coded drug language contained in recorded conversations).

The Government maintains that in providing that testimony, Shute will not be giving an opinion. But see *York*, 572 F.3d at 423. However, here, without the definitions, the jury will have little idea what the witness is talking about. That's not to say that Shute may not testify as

to how a document related to the investigation defines a term; but he may not testify as to his understanding of that term based on his professional experience. The Court recognizes that the lines it has drawn are fine ones and that it may need to provide further clarification during trial.[5]

### 2. Camera

The Government seeks to introduce evidence concerning certain cameras recovered during the execution of the search warrant. For a minimum of 3 years (since Februrary 2009), the Government's position has been that it does intend to rely on any cameras or photo memory sticks. Now, shortly before trial, the Government indicates that it would like to use that evidence. In this particular instance, given the lengthy pre-trial period, the Government's three-year stance related to this evidence, and the late disclosure to the Court and Defendant, the Court finds that the prejudice to Defendant in admitting the camera evidence outweighs the probative value to the Government. The Government's motion is denied with respect to the cameras.

### 3. Motion for Colloquy

The Government requests that Court admonish Defendant again of the perils associated with proceeding pro se and that his right to self-representation is not unlimited. The Court has done so and will continue to do so as necessary. Consistent with the Court's rulings during the pre-trial conferences in this case, this motion is granted.

### 4. Motion to Admonish Defendant on Evidentiary Matters

Consistent with the Court's rulings during the pre-trial conferences in this case, this motion also is granted. The Court has admonished the Defendant on the evidentiary matters raised by the Government and will continue to do so.

---

[5] At the pre-trial conferences on April 10 and April 18, the Government indicated that, after the Court's ruling, it may be required to designate an additional individual to present the opinion testimony that it had hoped to introduce through Mr. Shute. The Court indicated that it would permit the Government to do so, as (i) there is no prejudice to Defendant given his awareness of the lines of intended testimony and (ii) the helpfulness of such testimony to the jurors in this case.

## 5. Motion to Preclude Evidence or Arguments of Affirmative Defenses Absent Notice or Sufficient Pre-Trial Proffer

This motion is denied as moot. Defendant has consistently maintained, orally and in writing, the he does not intend to rely on or offer an affirmative defense. The Government's position is correct: if Defendant intends to offer evidence or argument regarding an affirmative defense, he must do so prior to trial. Consistent with the Court's rulings during the pre-trial conferences in this case, this motion is denied as moot as a result of the position repeatedly articulated by Defendant on the record.

## 6. Motion to Preclude Evidence of Defendants' Lawfulness and Prior Good Acts

Consistent with the Court's rulings during the pre-trial conferences in this case, this motion is denied without prejudice. The Court will address this issue on a case-by-case basis during the trial.

## 7. Motion to Preclude Evidence and Argument Designed to Elicit Jury Nullification

Consistent with the Court's rulings during the pre-trial conferences in this case, this motion is granted in part. The motion is granted with respect to evidence or argument designed to make the jury sympathetic to the impact of a possible conviction on Defendant and Defendant's family. The motion also is granted with respect to penalties – arguing punishment to a jury is "strongly disfavored" by the Seventh Circuit when a jury has no role in sentencing, and the Court sees no basis for departing from that wisdom here. See *United States v. Lewis,* 110 F.3d 417, 422 (7th Cir. 1997) (stating that "the practice of informing juries about the sentencing consequences of their verdicts is strongly disfavored"); *Shannon v. United States,* 512 U.S. 573, 579 (1994) (stating that a jury must "reach its verdict without regard to what sentence might be

imposed" and that "[i]nformation about the consequences of a verdict are irrelevant to a jury's task").

The motion is denied without prejudice as to the evidence or argument with respect for the Government's motives or conduct. If Defendant has an issue with the Government's motives or conduct, he should raise it in a sidebar and the Court will address it in light of the specific argument, evidence, or testimony sought to be introduced.

### 8.    Motion to Preclude Comments About Discovery

Consistent with the Court's rulings during the pre-trial conferences in this case, this motion is granted. Both sides are precluded from requesting, in the presence of the jury, discovery from witnesses or the opposing party. Requests should be made to the Court or opposing party outside the presence of the jury.

### 9.    Motion to Bar Defendant from Instructing Jury on Law

Consistent with the Court's rulings during the pre-trial conferences in this case, this motion is granted. It is the district court's province to instruct the jury on the law. Neither side should attempt to explain or instruct the jury on the law beyond reference to the jury instructions in closing arguments.

### 10.    Motion to Preclude Argument on Reasonable Doubt

Consistent with the Court's rulings during the pre-trial conferences in this case, this motion is granted. Both sides are barred from attempting to define reasonable doubt.

### G.    Government's Oral Motion to Use Exhibits During Opening Statements

The Government's motion to use exhibits during opening statements is denied. Opening statements of counsel are for the purpose of acquainting the jury in advance with the facts that counsel *expects* the evidence to show. Closing arguments, where the use of exhibits is

appropriate, are for the purpose of discussing the evidence actually admitted at trial. Allowing a party to use exhibits in openings (absent the consent of all parties) stamps that evidence with the imprimatur of evidence already admitted. As pointed out by Government counsel throughout the pre-trial conferences, trials, particularly criminal trials, are fluid. The parties' presentations can change during the course of a trial—by expansion or contraction or simply by the presentation of one piece of evidence over another. Allowing the use of exhibits not yet admitted into evidence not only runs the risk of a mistrial but also may be prejudicial in that the evidence would be presented without the context that often surrounds its formal introduction at trial. Absent the agreement of Defendant, the Court is unwilling to take those risks.

## II.     Defendant's Objections to the Government's Proposed Rule 702 Opinion Witnesses

Consistent with its obligations under Federal Rule of Criminal Procedure 16(a)(1)(G), the Government timely provided seven expert disclosure statements (along with various reports and other exhibits). Specifically, the Government identified the following individuals:

1.    Alan Coley: a proposed expert in digital evidence and computer forensics;

2.    William Mrazek: a proposed expert in the identification of propellants;

3.    John Winslow: a proposed expert in explosive devices;

4.    Robert Moberley: a proposed expert in forensic chemistry and analysis of explosives and explosive residues;

5.    Raymond Voorhees: a proposed expert in explosive device construction and functioning;

6.    Larry Harper: a proposed fingerprint expert; and

7.    John Cawley: a proposed handwriting expert.

At one of the pre-trial conferences, the Government indicated that it was unlikely to call Mr. Cawley at trial. Accordingly, the Court advised the parties that it would defer any consideration of Mr. Cawley's testimony and any objections thereto. As to the remaining six proposed experts, Defendant does not raise any challenges to the Government's disclosures regarding Mr. Mrazek, Mr. Moberley, or Mr. Harper. However, Defendant objects in some fashion to the proposed testimony of Mr. Coley, Mr. Winslow, and Mr. Voorhees. The Court will address the objections to each proposed expert in turn.

### A.     Alan Coley

Defendant acknowledges that Mr. Coley has attended many training classes, but challenges Coley's qualifications to testify as an expert in digital evidence and computer forensics. In support of his argument, Defendant comments that Coley's "education in computers is circumspect," noting that "a B.A. in History hardly qualifies him as an expert in computers." Defendant's observation may have a kernel of truth to it, in that formal education and expertise do not necessarily correlate. However, reviewing the Government's disclosure as a whole, there is much more to Mr. Coley's background than his university degree. He has spent more than 20 years as a postal inspector, including 10 years as a program manager in digital evidence, and the training programs listed on his C.V. cover almost three pages. It appears likely that Mr. Coley has the relevant experience to qualify as an expert in the fields in which he is being called to testify. Nevertheless, the Court will reserve ruling on Defendant's objections until the Government has established on the record at trial the witness's qualifications and Defendant has had an opportunity to test those qualifications through cross-examination. If the Court then rules that the witness is qualified, counsel for the Government may proceed to elicit the witness's opinions for the jury's consideration.

## B.     John Winslow

Defendant's comments on Mr. Winslow's proposed testimony consist of five lines.  He states that although "[t]here is no doubt that Mr. Winslow has the education and training to qualify as an expert * * * the Government's disclosure does not reach the standard set by *Daubert*, so I would have to challenge the admissibility of this expert's opinions."  Defendant's perfunctory articulation of his position in all likelihood falls short of the minimum required – even for a *pro se* litigant – to raise a *Daubert* argument for the Court's consideration.  See, *e.g.*, *United States v. Christian*, 2012 WL 763177, at *7 n.1 (7th Cir. Mar. 12, 2012) (noting that "[t]he defendant did not rise any *specific* objections to Agent Manns' qualifications, methods, or reliability before the district court" and commenting that "[w]hen neither party *specifically* asks the district court to engage in this analysis under Rule 702, the district court is not required to do so and does not err in admitting the testimony") (emphasis added).  The Court nevertheless construes Defendant's concerns to relate to methodology and/or reliability, not to qualifications, and has scrutinized the Government's disclosure and supplemental disclosure with those concerns in mind.

The prerequisites for testimony from a Rule 702 opinion witness – in short hand, an "expert" – are (1) appropriate qualifications, (2) a reliable methodology, (3) opinions that follow rationally from the application of the witness's expertise, and (4) testimony that is relevant to the case at bar and thus helpful to the trier of fact.  See *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151-53 (1999); *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-93; see also *Metavante Corp. v. Emigrant Savings Bank*, 619 F.3d 748, 760 (7th Cir. 2010) (summarizing that under *Daubert*, "the district court was required to 'ensure that the expert testimony at issue both rests on a

reliable foundation and is relevant to the task at hand'"). The Rule 702 inquiry is "a flexible one" (*Daubert*, 509 U.S. at 594), and thus reviewing courts "give the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable" (*Bielskis v. Louisville Ladder, Inc.* 663 F.3d 887, 894 (7th Cir. 2011)).

Taking into account the entirety of those disclosures, the Court concludes that on the basis of (1) Mr. Winslow's knowledge, skill, experience, training, education, and examinations of the devices at issue in this case, (2) the methodology that he has disclosed explaining the nature of the examinations that he conducted, and (3) how his reported conclusions follow from his observations, Mr. Winslow's proposed testimony is sufficiently reliable and relevant to matters in dispute that it will be helpful to the trier of fact, and thus is admissible at trial. In fact, Mr. Winslow's disclosure itself very succinctly sets out, in step-by-step manner, the process of his reasoning from the available data – the components of the devices that he examined – to the conclusions that he reached in regard to whether the devices were explosive bombs.

### C.    Raymond Voorhees

Defendant specifically acknowledges that Mr. Voorhees appears to have the qualifications to be certified as an expert, but contends that his conclusions "do not appear to be based on any scientifically verifiable methodology" and his submission contains "nothing that can be reviewed to determine accuracy." The Government's disclosure and accompanying materials indicate that Voorhees has extensive experience – more than 40 years in some respects – in a wide range of areas relating to improvised explosive devices, firearms, ammunition and forensic ballistics, and other areas relating to forensic science and security matters. His proposed testimony follows visual, physical, and microscopic inspections and examinations of the

components of the devices referenced in the superseding indictment. In some respects, he has relied on the work of other government experts (including Mr. Moberly), which is proper under Federal Rule of Evidence 703. According to his disclosure, Mr. Voorhees would provide testimony about the functions and capabilities of the component parts of the devices, including whether the devices could have exploded. He also proposes to testify to the similarities between the devices charged in the indictment and two additional devices found in Defendant's storage locker.

Based on the Court's examination of the totality of the materials submitted along with the Government's Rule 16 disclosure regarding Mr. Voorhees, the Court concludes that, at a minimum, Mr. Voorhees qualifies as an expert based on his education, experience, and training. The Court further concludes that the opinions that he proposes to offer rest on the application of his training and experience to the characteristics of the devices at issue in this case. On its face, "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Trustees of the Chicago Painters & Decorators Pension, Health & Welfare, and Deferred Savings Plan Trust Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787 (7th Cir. 2007); see also Fed. R. Evid. 702 ("a witness qualified as an expert by knowledge, skill, experience, training or education, may testify * * *"). And "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience" (*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999)) – which is precisely what Voorhees's disclosure claims he will do if he is called to testify at trial.

Defendant's specific complaints about the adequacy of the Government's disclosure as to Voorhees relate to the absence of measurements, error rates, and other analysis that Defendant contends could have been performed to determine accuracy. Defendant appears to suggest that

Voorhees's opinions are "worthless" because they lack "precision." But the Seventh Circuit has stressed that "[a]n expert's testimony is not unreliable simply because it is founded on his experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education.'" *Metavante Corp.*, 619 F.3d at 761 (emphasis in original). Indeed, as the court of appeals observed, "[c]riminal cases, for instance, are replete with examples of experts, such as police officers and informants, qualified by experience." *Id.* at 761 n.8. The Government's disclosure indicates that Voorhees has brought his experience and expertise to bear on specific items at issue in the case, and thus has opinions that may be of value to the jury in deciding the case. To the extent that Defendant believes that Voorhees's opinions fall short of the mark because there is more that he could have done to utilize "science and precision examination," Defendant of course is free to probe those matters at trial. But criticisms of that nature "do not go to admissibility but to the appropriate weight that should be accorded to the evidence." *Metavante Corp.*, 619 F.3d at 762. "Determinations on admissibility should not supplant the adversary process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010); see also *Huey v. United Parcel Service*, 165 F.3d 1084, 1087 (7th Cir. 1999) (explaining that the opinion of a Rule 702 expert "has a significance proportioned to the sources that sustain it").

## III.  Conclusion

For the reasons stated throughout this order, Defendant's motion for bill of particulars [288] is denied, Defendant's fourth motion for discovery [306] is granted, Defendant's motions in limine [304] are granted in part and denied in part consistent with this opinion and the Court's rulings on the record in open court, and Defendant's fourth motion for return of seized property

[312] is denied without prejudice. The Government's motion for admissibility of evidence per FRE 404(b) [301] is provisionally granted subject to the possibility that some or all of the specified evidence may be admissible as direct evidence at trial. The Government's consolidated motions in limine [302] are granted in part and denied in part consistent with this opinion and the Court's rulings on the record in open court, and the Government's request to use exhibits during opening statements is denied. Finally, Defendant's objections to the Government's proposed expert witnesses are reserved as to Alan Coley and overruled as to John Winslow and Raymond Voorhees.

Dated: April 19, 2012

_____
Robert M. Dow, Jr.
United States District Judge